# United States Court of Appeals
## For the First Circuit

No. 14-1327

C.W. DOWNER & COMPANY,

Plaintiff, Appellant,

v.

BIORIGINAL FOOD & SCIENCE CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Barron, Circuit Judges.

Steven J. Torres, with whom Kate S. Swartz and Torres Scammon & Day LLP were on brief, for appellant.
Alan D. Rose, Jr., with whom R. Victoria Fuller and Rose, Chinitz & Rose were on brief, for appellee.

November 12, 2014

**LYNCH, Chief Judge**.  The Due Process Clause of the Fourteenth Amendment allows a state's courts to exercise jurisdiction over a nonresident defendant only when doing so "does not offend 'traditional notions of fair play and substantial justice.'"  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).  This contract case presents these issues where the parties' contacts were not first-hand and involved no physical presence in Massachusetts, but were by phone, e-mail, and internet over an international border.  The district court concluded that it could not exercise personal jurisdiction over the defendant consistently with the Due Process Clause.  C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., No. 13-11788-DJC, 2014 WL 815189 (D. Mass. Mar. 3, 2014).  We conclude to the contrary that the Massachusetts courts do have long-arm jurisdiction over the Canadian defendant.

In 2009, the defendant Bioriginal Food & Science Corporation, a Canadian company, contracted with C.W. Downer & Co., a Massachusetts investment bank, to be its exclusive financial advisor for the sale of its business.  The parties negotiated and executed the agreement remotely, and subsequently spent four years collaborating from their respective home offices.  Downer later sued in state court in Massachusetts for breach of contract, and Bioriginal removed the case to federal court.  The district court dismissed for lack of personal jurisdiction.  In light of the

-2-

nature, the number of contacts over time, the origin, and the duration of the parties' contacts, we hold that the exercise of long-arm jurisdiction by Massachusetts is consistent with fair play and substantial justice. We reverse and remand.

I.

Downer is a global investment bank founded and headquartered in Boston, Massachusetts. Twenty-three of its seventy-five employees work in Boston. Bioriginal is a Canadian corporation that produces omega-based nutritional supplements, and is headquartered in Saskatoon, Saskatchewan.

In September 2008, Christopher Johnson visited Boston. Johnson was an employee of Bioriginal investor Crown Capital and sat on Bioriginal's Board of Directors as its de facto chairman. While in Boston, Johnson met with Downer in Downer's headquarters. The purpose of the meeting is not in evidence. However, Johnson "indicated" to Downer while meeting there that Bioriginal "would be offered for sale in the next twelve months." The record does not reveal whether Johnson explicitly approached Downer on behalf of Bioriginal.

After the meeting, Downer contacted Bioriginal, referencing Johnson's visit. Bioriginal (including Johnson and CEO Joseph Vidal) and representatives from Downer's Boston office remotely negotiated by calls, e-mails, and teleconferences a Letter

Agreement under which Bioriginal hired Downer to assist in the sale of Bioriginal. On March 16, 2009, Vidal transmitted his signed copy of the agreement, dated March 12, to Downer in Boston. There was never a physical meeting of the contracting parties.

Under the terms of the Letter Agreement, Downer acted as Bioriginal's exclusive financial adviser in connection with the potential sale of Bioriginal. The agreement provided it could be terminated by either party with thirty days written notice. According to Downer, neither side ever provided such written notice. The agreement also contained a choice-of-law provision in favor of Saskatchewan law and consent by both parties to jurisdiction in Saskatchewan courts, but it did not, by its terms, preclude suit in Massachusetts.

Bioriginal agreed to pay Downer four "Milestone Payments" of $20,000 when specified tasks were completed, three of which it subsequently made to Downer in Massachusetts. Bioriginal also agreed to pay Downer another contingent fee for each completed transaction involving Bioriginal and another company "prior to the termination of this program." The contingent transaction fee stated is the greater of $420,000 or $200,000 plus one to five percent of the transaction value (depending on the size of the transaction). All paid Milestone Payments were to be deducted from this contingent fee for the completion of a transaction, so long as the resulting amount was not less than a specified value.

Three members of Downer's Boston office handled Downer's performance under the contract. (Downer has no other North American offices.) They communicated regularly but remotely with Vidal, Johnson, and other members of Bioriginal's management team and board. From April to July 2009, Downer prepared a detailed Information Memorandum which the parties exchanged with comments eleven times. Downer regularly received input from Vidal by teleconferences and e-mail, including an e-mail from Vidal to Downer collecting comments from Bioriginal board members. By September 2009, Downer had contacted 206 potential buyers and received four bids, keeping Vidal "abreast of its efforts" all the while. Downer then worked with Bioriginal's management and a subcommittee of the Board to prepare a joint management presentation for select bidders. Bioriginal gave input even at the level of preparing individual slides of the presentation.

Though no sale of Bioriginal was made in 2009 or 2010, Downer continued to work on getting Bioriginal a deal. From February 2011, Downer contacted potential suitors and exchanged information with Bioriginal before delivering an "M&A Update" document on May 2, 2011, at Bioriginal's request. Downer persisted in its efforts to secure a buyer. Downer says in September 2011 it identified a private equity group as a potential buyer and informed Bioriginal. Downer then hosted a conference call the next month, October 2011, for Bioriginal and the private equity group to

explore an acquisition of Bioriginal. The potential sale never took place. Downer claims that its personnel remained in contact with Bioriginal through 2013. Downer's managing director asserted in his affidavit that there were periodic phone calls and e-mails with Vidal.

Sometime in the spring of 2013, Downer learned that Bioriginal had been sold to Westbridge Capital, Ltd.[1] Downer asked Borignial to pay its transaction fee and the fourth Milestone Payment, but Bioriginal refused. Downer states that Bioriginal has asserted that it had terminated the agreement earlier, perhaps in 2009. Here, Bioriginal seems to ground its merits defense on the argument that Downer was not involved in the sale of Bioriginal to Westbridge.

On July 1, 2013, Downer sued Bioriginal in Massachusetts Superior Court claiming breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violation of the Massachusetts unfair trade practices statute, Mass. Gen. Laws ch. 93A. Bioriginal removed the case to federal district court in Massachusetts on July 26. On August 16, Bioriginal moved to dismiss, arguing that the court lacked personal jurisdiction over Bioriginal, that a forum non conveniens dismissal

---

[1] Westbridge is a private equity firm that partnered with Bioriginal's management team for a management buy-out.

-6-

was appropriate in favor of Saskatchewan court, and that Downer's 93A claim should be dismissed for failure to state a claim.

The district court allowed the motion to dismiss for lack of jurisdiction under Rule 12(b)(2), did not reach the forum non conveniens issue, and denied as moot the 12(b)(6) motion to dismiss the 93A claim. This appeal followed.

## II.

Where, as here, a district court dismisses a case for lack of personal jurisdiction based on the prima facie record, rather than after an evidentiary hearing or factual findings, our review is de novo. E.g., Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008). In reviewing the facts, we take the plaintiff's evidentiary proffers as true and construe them in the light most favorable to the plaintiff's claim, and we also consider uncontradicted facts proffered by the defendant. Daynard v. Ness, Motley, Loadholt, Richardson, & Poole, P.A., 290 F.3d 42, 51 (1st Cir. 2002).

To establish personal jurisdiction in a diversity case, a plaintiff must satisfy both the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment. Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994). The district court and the parties each proceed directly to the constitutional analysis, and we will do so as well.

Downer asserts only that Massachusetts has specific in personam jurisdiction over Bioriginal, not general jurisdiction. That is, the jurisdictional basis for Downer's suit arises from and is limited to Bioriginal's suit-related conduct. See Walden v. Fiore, 134 S. Ct. 1115, 1121 (2014). To evaluate whether Bioriginal's suit-related conduct creates the necessary minimum contacts with Massachusetts, courts consider (1) whether the claim "directly arise[s] out of, or relate[s] to, the defendant's forum state activities;" (2) whether the defendant's in-state contacts "represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable;" and (3) whether the exercise of jurisdiction is reasonable. Daynard, 290 F.3d at 60-61 (quoting Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 144 (1st Cir. 1995)) (internal quotation marks omitted).

There is one fact about this case which has not been recognized in the briefing. It is that a state's long-arm jurisdiction is being asserted against a defendant who is in a foreign country, and not in a sister state. In Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102 (1987), the Court applied the usual three part analysis in a foreign-defendant case. Id. at 109-16. As to the reasonableness prong, in Part II.B of its

opinion, the Court noted that the reasonableness of the exercise of jurisdiction depends on different factors, including the "burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." Id. at 113. A court "must also weigh in its determination 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies[] and the shared interests of the several States in furthering fundamental substantive social policies.'" Id. (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)). The Court applied those considerations with special emphasis in light of that case's factual context, including the defendant's international home forum. We return to Asahi when we discuss reasonableness.

Downer must succeed on all three prongs in order to establish personal jurisdiction. We hold that it has.

## A. Relatedness

Bioriginal did not contest relatedness in the district court and spends less than three pages of its brief here on the issue. We discuss it because the district court found no relatedness, as it found no purposeful availment. Downer, 2014 WL 815189, at *3.

The relatedness prong requires the plaintiff to show "a demonstrable nexus between [its] claims and [the defendant's] forum-based activities, such . . . [that] the litigation itself is

founded directly on those activities."  Adelson v. Hananel, 652
F.3d 75, 81 (1st Cir. 2011) (third and fourth alterations in
original) (internal quotation marks and citation omitted).  This
test is a "flexible, relaxed standard."  Id. (internal quotation
marks and citation omitted).  In a contract case, we focus on "the
parties' 'prior negotiations and contemplated future consequences,
along with the terms of the contract and the parties' actual course
of dealing.'"  Daynard, 290 F.3d at 52 (quoting Burger King Corp.
v. Rudzewicz, 471 U.S. 462, 479 (1985)).  We conduct this analysis
with reference to the contacts the defendant creates with the forum
state, though those contacts may be "intertwined" with the
activities of the plaintiff.  Walden, 134 S. Ct. at 1122-23; see
Adams v. Adams, 601 F.3d 1, 6 (1st Cir. 2010) (discussing "whether
the defendant's activity in the forum state was instrumental either
in the formation of the contract or its breach" or whether the
defendant was "subject to substantial control and ongoing
connection to [the forum state] in the performance of th[e]
contract" (first alteration in original) (internal quotation marks
and citations omitted)).

In this case, the evidence of contacts during the course
of dealing is powerful.  Bioriginal had an ongoing connection with
Massachusetts in the performance under the contract.  Downer's
claims arise from the alleged breach of that contract.  That is
enough to establish relatedness.  See Adelson, 652 F.3d at 81-82.

B.  Purposeful Availment

We now turn to the "purposeful availment" prong.  The purposeful availment prong "represents a rough quid pro quo: when a defendant deliberately targets its behavior toward the society or economy of a particular forum, the forum should have the power to subject the defendant to judgment regarding that behavior." Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st Cir. 2011). The cornerstones of this inquiry are voluntariness and foreseeability.  Daynard, 290 F.3d at 61.  This places the emphasis on the defendant's intentions and prohibits jurisdiction based on "random, fortuitous, or attenuated contacts."  Carreras, 660 F.3d at 555 (quoting Burger King, 471 U.S. at 475) (internal quotation marks omitted).  Purposeful availment is an equally important factor when foreign defendants are involved.  See J. McIntyre Mach., Ltd. v. Nicastro, 131 S. Ct. 2780, 2790-91 (2011) (plurality opinion).

The contacts here clearly were not random, fortuitous, or attenuated.  First, the genesis of the Downer engagement strongly supports the case for purposeful availment.  After all, Downer first learned of Bioriginal's sale from Johnson, Bioriginal's de facto chairman, in Downer's Boston office.  Cf., e.g., Adelson, 652 F.3d at 82-83 (relying in part on solicitation); Phillips, 530 F.3d at 29 (emphasizing the absence of solicitation when finding no

-11-

purposeful availment).  Johnson's statement was certainly voluntary, and there is nothing to indicate Bioriginal lacked foreseeability as to it.  Downer, in response, then contacted Bioriginal's headquarters to negotiate the agreement.  Downer's call to Bioriginal was not a cold call: it was with reference from Johnson.

Second, the contract was not of a short duration or quickly accomplished.  Bioriginal had a four-year working relationship with Downer, including intense periods with many exchanges.[2]  Bioriginal knew or should have expected Downer's Boston office -- its only North American office, and the one with which Bioriginal negotiated the Letter Agreement -- to be the site of its partner team.  This was no small project: according to the Letter Agreement, Downer was Bioriginal's "exclusive financial adviser" on the sale of the entire firm.  To that end, Bioriginal personnel (including its CEO and Board) and Downer's Boston office collaborated intensively.  The record includes statements from Downer personnel detailing contacts, eleven emails and documents traded between the two firms, and eleven iterations on one document.  Moreover, many of those e-mails refer to other e-mails or to phone calls and teleconferences involving Bioriginal and

---

[2] The record contains some conflict about whether Downer's relationship with Bioriginal terminated in 2009.  Downer alleges that the relationship lasted the full four years, and we take that as true under the prima facie approach.  E.g., Daynard, 290 F.3d at 51.

Downer's Boston office.  Bioriginal and Downer worked together on significant documents, and Bioriginal provided its input on many items, including individual slides.  As part of that work, Downer asserts it contacted hundreds of potential buyers on Bioriginal's behalf.  At least once, Downer arranged and hosted a conference call with Bioriginal and a potential buyer.  And Bioriginal sent three payments to Downer in Boston.

To be sure, the purposeful availment inquiry is focused on contacts between the defendant and the forum state, not between the defendant and the plaintiff.  Walden, 134 S. Ct. at 1122.  The contacts here, however, are hardly the "random," "fortuitous," "attenuated," or "isolated" contacts inadequate to give rise to jurisdiction.  Burger King, 471 U.S. at 475 & n.18.  Rather, Bioriginal "reach[ed] out beyond" Canada and into Massachusetts by "entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum state."  Walden, 134 S. Ct. at 1122 (quoting Burger King, 471 U.S. at 479-80).

True, many of the e-mails, phone calls, and other activities were originated by Downer in Massachusetts and directed to Bioriginal and third parties elsewhere (although others were directed by Bioriginal to Downer in Massachusetts).  But it makes little sense to focus too much on who initiated a particular contact in exploring a lengthy course of dealing in a services contract.  By retaining Downer, Bioriginal actively caused Downer

-13-

to undertake extensive activities on Bioriginal's behalf within Massachusetts. Part of what Bioriginal was paying for was for Downer to take initiative on its behalf. And so, while a plaintiff's "unilateral activity" cannot constitute a jurisdictional contact, World-Wide Volkswagen, 444 U.S. at 298 (internal quotation marks omitted), Downer's extensive Massachusetts activities in this case, given the context, were not "unilateral." They were undertaken at Bioriginal's request and are attributable to Bioriginal.

The district court's rejection of jurisdiction was based on reasoning that "interstate communications by phone and mail are insufficient to demonstrate purposeful availment" absent other contacts. Downer, 2014 WL 815189, at *4. The district court then concluded that Bioriginal negotiated the agreement from Canada, felt the benefit of the agreement in Canada, and was in breach of the agreement by failing to act in Canada. Id. at *3-6. Bioriginal urges the same on appeal.

That reasoning does not support rejection of jurisdiction. "[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines . . . ." Burger King, 471 U.S. at 476. In light of this reality, the Supreme Court has "consistently rejected" a physical contact test for personal jurisdiction. Id. Before Burger King, in International Shoe, the

-14-

Court had already said that a nonresident's physical presence within the territorial jurisdiction of the court is not required. 326 U.S. at 316.

It is not true that interstate remote communications are, by their nature, per se insufficient to constitute contacts that sustain personal jurisdiction. See Daynard, 290 F.3d at 61 n.11 ("The transmission of facts or information into Massachusetts via telephone or mail would of course constitute evidence of a jurisdictional contact directed into the forum state." (quoting Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 36 (1st Cir. 1998)) (internal quotation marks omitted)). A nonresident defendant purposefully avails itself of the forum state when the defendant's actions "create a 'substantial connection' with the forum State." Burger King, 471 U.S. at 475 (quoting McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)).[3] A "substantial connection" can arise whenever the defendant deliberately directs its efforts toward the forum state. Id. at 476. Jurisdiction has been upheld where the defendant purposefully reached out "beyond their State and into another by, for example, entering a contractual relationship that envisioned continuing and wide-reaching contacts in the forum State." Walden, 134 S. Ct. at 1122

---

[3] As the district court emphasized, convincing indicia of a substantial connection include a nonresident's physical trips to the forum state or a nonresident's solicitation of business in the forum state. See, e.g., Adelson, 652 F.3d at 82-83.

-15-

(quoting <u>Burger King</u>, 471 U.S. at 479-80) (internal quotation marks omitted). The number and duration of the remote contacts are significant to the analysis.

The district court's reasoning drew on two different categories of cases. First, the district court analogized to "passive purchaser" cases, in which the nonresident defendant merely purchases and receives goods from the forum state. <u>See</u> <u>R & B Splicer Sys., Inc.</u> v. <u>Woodland Indus., Inc.</u>, No. 12-11081-GAO, 2013 WL 1222410 (D. Mass. Mar. 26, 2013); <u>cf.</u> <u>Telford Aviation, Inc.</u> v. <u>Raycom Nat'l, Inc.</u>, 122 F. Supp. 2d 44, 47 (D. Me. 2000) (finding no purposeful availment where nonforum resident exchanged communications with forum resident only to schedule delivery of services). Bioriginal was not passive. It actively negotiated the contract and the contract required interactive communications between the two companies for an extended period of time. Nor is this like cases where the defendant passively puts an item in the stream of commerce. <u>See</u>, <u>e.g.</u>, <u>J. McIntyre Mach.</u>, 131 S. Ct. at 2788.

Second, the district court analogized to cases in which clients sue their nonresident lawyers for legal malpractice. <u>See</u>, <u>e.g.</u>, <u>Kowalski</u> v. <u>Doherty, Wallace, Pillsbury, & Murphy</u>, 787 F.2d 7 (1st Cir. 1986). These cases are inapt for multiple reasons. Most significant, they present the reverse scenario from this case: in those cases, a client sought to sue a service provider at the

-16-

client's home.  Unlike this case, they do not involve a defendant who procured the performance of extensive services in the very forum in which the defendant would be subject to jurisdiction.[4]

C.  Reasonableness

Though Downer has satisfied the first two prongs of the analysis, we must nonetheless assure ourselves that Massachusetts' assertion of jurisdiction is fair and reasonable.  We do so with reference to five "gestalt" factors:

> (1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Ticketmaster-New York, 26 F.3d at 209 (citing Burger King, 471 U.S. at 477).  These factors typically "play a larger role in cases" -- unlike this one -- "where the minimum contacts question is very close."  Adelson v. Hananel, 510 F.3d 43, 51 (1st Cir. 2007); see Ticketmaster-New York, 26 F.3d at 210 ("[T]he weaker the plaintiff's showing on the first two prongs . . . the less a defendant need show in terms of unreasonableness to defeat jurisdiction.")  We do not consider the minimum contacts issue to be very close.

_____

[4] Our conclusion is also entirely consistent with the Letter Agreement's jurisdictional provision.  The agreement includes a choice of law provision in favor of the law of Saskatchewan and consent by Downer to jurisdiction of Saskatchewan courts, but it does not include a forum selection clause.

Nor is the fact that a foreign defendant is involved of much moment here. Those concerns are of far less weight in this case than in Asahi. Bioriginal identifies no special burden imposed by requiring it to litigate across the Canada-United States border, nor any international policy burdened by Massachusetts's exercise of jurisdiction. Massachusetts, Saskatchewan, and all individuals involved transact business in a common language, English. Indeed, even in the Massachusetts forum, Saskatchewan will have its laws govern the substantive issues in the case, and Bioriginal itself has emphasized the similarities between Saskatchewan and Massachusetts law. The international dimensions of the case do not create "unique burdens" for Bioriginal. Asahi, 480 U.S. at 114. Indeed, Bioriginal makes no claim to that effect. See United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 987 F.2d 39, 46-47 (1st Cir. 1993).

We compare Asahi's facts to those of this case. The dispute in Asahi was whether "a Japanese corporation should indemnify a Taiwanese corporation on the basis of a sale made in Taiwan and a shipment of goods from Japan to Taiwan." 480 U.S. at 115. Jurisdiction over the defendant would have required the defendant, from a civil law country, to litigate in California. See, e.g., Shishido, Japanese Corporate Governance, 25 Del. J. Corp. L. 189, 195 (2000). The defendant also would have had to litigate across the Pacific Ocean. And the burden of litigating at such a

-18-

distance was greater given that the transaction underlying the claim took place entirely in Asia.  <u>Asahi</u>, 480 U.S. at 114.  None of these burdens are present in this case.

Bioriginal does emphasize the inconvenience imposed on any witnesses who will be required to travel from Saskatoon to Boston. This is a far milder complaint than in <u>Asahi</u>, which concerned the burden of conducting the entire course of litigation at substantial distance from the defendant's normal forum.  480 U.S. at 114.  This inconvenience does not determine the outcome of our jurisdiction analysis.  "[M]ounting an out-of-state defense most always means added trouble and cost," <u>BlueTarp Fin., Inc.</u> v. <u>Matrix Constr. Co.</u>, 709 F.3d 72, 83 (1st Cir. 2013), and modern travel "creates no especially ponderous burden for business travelers," <u>Pritzker</u> v. <u>Yari</u>, 42 F.3d 53, 64 (1st Cir. 1994).  For this type of burden to affect the analysis, the defendant must show that it is "special or unusual."  <u>BlueTarp Fin.</u>, 709 F.3d at 83 (quoting <u>Hannon</u> v. <u>Beard</u>, 524 F.3d 275, 285 (1st Cir. 2008)) (internal quotation marks omitted).  Bioriginal has not done so.  And we suspect that the merits issues may come down to a question of contract interpretation for the court.  Most logistical challenges can be resolved through the use of affidavits and video devices.[5]

---

[5] Bioriginal stresses that Massachusetts courts lack jurisdiction to subpoena Johnson, who now lives in Toronto and no longer is affiliated with Bioriginal, if he were not to come voluntarily.  <u>See</u> 9A Wright & Miller, <u>Fed. Prac. & Proc. Civ.</u> § 2462 (3d ed.).  Downer and Bioriginal dispute whether Johnson's

In this case, the gestalt factors do not overcome the earlier showing. The parties have identified few burdens, interests, or inefficiencies that cut strongly in favor of or against jurisdiction. In our view, a particularly weighty factor is Massachusetts's interest in adjudicating the dispute. Cf. Asahi, 480 U.S. at 115-16 (identifying California's "minimal" interest in the validity of the indemnification claim, a loss allocation question between two foreign corporations). Massachusetts has "significant" interests in providing a convenient forum for disputes involving its citizens and in ensuring that its companies have easy access to a forum when their commercial contracts are said to be breached by out-of-state defendants.[6] Champion Exposition Servs., Inc. v. Hi-Tech Elec., LLC, 273 F. Supp. 2d 172, 179 (D. Mass. 2003); see BlueTarp Fin., 709 F.3d at 83 (recognizing Maine's "stake in being able to provide a convenient forum for its slighted residents" and in "redressing harms committed against its companies by out-of-state companies"); Sawtelle v. Farrell, 70 F.3d 1381, 1395 (1st Cir. 1995) (noting that these interests have "added importance in our age of advanced telecommunications" in which parties contract

_____

testimony is even relevant to the merits arguments and whether there is a Saskatchewan court with power to reach Johnson in a different province, Ontario.

[6] Although Saskatchewan law governs the contract, these interests in providing a forum are independent of the substantive law applied by the forum. See Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 718 (1st Cir. 1996) (valuing Massachusetts's forum interests in claims governed by Hong Kong law).

-20-

without meeting in person); <u>C & M Mgmt., Inc.</u> v. <u>Cunningham-Warren Props., LLC</u>, No. 12-P-1944, 3 N.E.3d 1119, at *4 (Mass. App. Ct. Feb. 27, 2014) (unpublished) (explaining that Massachusetts "has a manifest interest in providing a convenient forum to residents asserting good faith and objectively reasonable claims for relief").

In opposition to this interest, Bioriginal marshals the choice-of-law provision in favor of Saskatchewan law, and it argues that the contractual transaction fee provision is non-standard, "presenting a matter of first impression under Saskatchewan law." We see no injustice in having a Massachusetts court interpret the contract. As the district court noted, "federal district courts are in the regular practice of applying laws of other" fora. <u>Downer</u>, 2014 WL 815189, at *8.

We conclude where we began. Downer's showing on the first two prongs of the inquiry is strong, so Bioriginal carries the burden of defeating jurisdiction with a similarly strong showing of unfairness. To the limited extent that the gestalt factors are meaningful, they weigh in favor of jurisdiction even considering the international context. Bioriginal has not met its burden.


III.

The dismissal is <u>reversed</u> and the case <u>remanded</u> for further proceedings consistent with this opinion. Each party is to bear its own costs of appeal.

-21-

<u>So ordered.</u>